# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

NOEL LIRIO GONZALES,

    Petitioner

v.

ISIDRO BACA, *et al.*,

    Respondents.

Case No.: 2:16-cv-02015-RFB-DJA

**Order**

This case is a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 by Noel Lirio Gonzales. ECF No. 12. This case is before this Court for adjudication of the merits of Gonzales' petition. The Court denies Gonzales' petition, denies him a Certificate of Appealability, and directs the Clerk of Court to enter judgment accordingly.

## I.   BACKGROUND

Gonzales' convictions are the result of events that occurred in Clark County, Nevada on or about November 15, 2012. ECF Nos. 21-4, 25-12, 27-4. In its order affirming Gonzales' convictions, the Nevada Court of Appeals described the crime, as revealed by the evidence at Gonzales' trial, as follows:

> Michelle Damaya [sic] was in the garage of her home vacuuming her car while her 22-month-old daughter Abigail napped inside the house. Three people, a woman and two men, entered through the open garage door and accosted Michelle. The shorter of the two men, later identified as Gonzales, was wearing a mask and had the hood of his sweatshirt pulled over his head so that Michelle could not immediately see his face. Gonzales pointed a gun at Michelle and told her, "we want your guns, we want your money." The woman motioned for Michelle to go inside the house, and she complied.

At gunpoint, Michelle led the trio to the master bedroom, where they ransacked the room in search of valuables. The trio asked Michelle where any guns and money were kept, but Michelle answered that she did not know because her husband had recently moved his guns in order to prevent Abigail from accidentally finding them. The woman responded by calling Michelle stupid for not knowing where anything was. Eventually, after searching the entire room, the perpetrators found a safe and forced Michelle to open it. The perpetrators then forced Michelle to hold laundry baskets for them to fill with items from the safe.

Michelle asked if she could go get Abigail, but the perpetrators refused. Following repeated and increasingly insistent requests by Michelle, Gonzales eventually gave permission and Michelle retrieved her daughter. At some point Gonzales and the female perpetrator split up to search other rooms of the house while the taller man stayed in the master bedroom with Michelle and Abigail. The taller man continued searching the master bedroom and eventually discovered a hidden firearm owned by Michelle's husband.

After a few minutes, the woman called Michelle to another room where Michelle watched her go through the drawers of a desk. Michelle asked the taller man why they were there, and he replied that they had been hired to "come get your guns and money." The trio then scattered throughout the house in search of more valuables, leaving Michelle and Abigail alone. Michelle ran to a side door that she had previously left unlocked, but apparently had been locked by the perpetrators during the crime, unlocked it, and fled the house with Abigail to a neighbor's residence where she called 9-1-1. Police officers arrived moments later and quickly located the woman and the taller man who had accompanied Gonzales. They also found a car parked in Michelle's driveway in which documents bearing Gonzales' name were later discovered.

While police officers worked to establish a perimeter around the house, Gonzales voluntarily approached a police detective parked on the street and spontaneously uttered, in English, "I was involved. It was me. I was involved." He was immediately arrested and searched, and property belonging to Michelle and her husband was found on his person. After the search, Gonzales asked, again in English, to be placed into the police car rather than be left standing in the street, and officers complied. Gonzales remained seated in the police car for approximately one hour with one back door open and the air conditioning turned on while the police continued to investigate the scene.

Gonzales was then transported to police headquarters and interrogated by Detective Patrick Flynn. Prior to the interrogation, Detective Flynn administered warnings, in English, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In English, Gonzales stated that he understood his rights and agreed to be questioned. Flynn repeated the warnings again, in slightly different and less formal language, later during the questioning. Gonzales, whose native language is Tagalog, never requested the

assistance of an interpreter, and none was provided. The entire interrogation was conducted in English and tape-recorded. Gonzales subsequently confessed to the offenses in detail in English.

ECF No. 29-9 at 2-5.

On August 15, 2013, following a jury trial, Gonzales was found guilty of conspiracy to commit robbery, burglary while in possession of a deadly weapon, robbery with the use of a deadly weapon, and first-degree kidnapping with the use of a deadly weapon. ECF No. 28-2. Gonzales was sentenced to 24 to 60 months for the conspiracy conviction, 48 to 120 months for the burglary conviction, 60 to 180 months for the robbery conviction plus a consecutive term of 60 to 180 months for the deadly weapon enhancement, and life with parole eligibility after 5 years for the first-degree kidnapping conviction plus a consecutive term of 24 to 120 months for the deadly weapon enhancement. ECF No. 28-7. Gonzales appealed, and the Nevada Court of Appeals affirmed on July 2, 2015. ECF No. 29-9. Remittitur issued on July 27, 2015. ECF No. 29-10.

Gonzales filed his pro se state habeas petition on June 16, 2016. ECF No. 29-12. The state district court denied Gonzales' petition on September 19, 2016. ECF No. 29-16. Gonzales did not appeal.

Gonzales filed his pro se federal habeas petition and his counseled amended petition on September 29, 2017, and July 19, 2018, respectively. ECF Nos. 5, 12. Gonzales' amended petition raises a sole ground for relief: there was insufficient evidence to sustain his dual convictions for robbery and first-degree kidnapping. ECF No. 12 at 6. The Respondents answered Gonzales' amended petition on January 11, 2019. ECF No. 20. Gonzales replied on February 11, 2019. ECF No. 31.

//

//

## II.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "'if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court . . . .'" Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000), and citing Bell v. Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. at 75 (quoting Williams, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Id. (quoting Williams, 529 U.S. at 410). "The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer, 538 U.S. at 75). See also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.   DISCUSSION

In Gonzales' sole ground for relief, he alleges that his federal constitutional rights were violated because there was insufficient evidence to sustain his dual convictions for robbery and first-degree kidnapping because the evidence presented showed the kidnapping was incidental to the robbery. ECF No. 12 at 6-7. The Respondents argue that the movement of the victim from her open, public garage to the private interior of her home created a risk of danger that substantially exceeded that necessary for the crime of robbery, so the robbery and kidnapping were not incidental. ECF No. 20 at 8. In its order affirming Gonzales' convictions, the Nevada Court of Appeals held:

> Gonzales contends the evidence in this case was insufficient to sustain convictions for both first-degree kidnapping with the use of a deadly weapon and robbery with use of a deadly weapon.
>
> The test for sufficiency of the evidence in a criminal case is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]t is the jury's function . . . to assess the weight of the evidence and . . . credibility of witnesses." *Id.*

2

In this appeal, Gonzales does not challenge the sufficiency of the evidence supporting his individual convictions for robbery, burglary, or conspiracy. Instead, he challenges only the evidence underlying the first-degree kidnapping conviction, contending that the facts sustaining the kidnapping conviction were intertwined with those proving the robbery conviction and therefore he cannot be convicted of both crimes.

The crime of robbery is articulated in NRS 200.380, while the crime of first-degree kidnapping is described in NRS 200.310(1). A conviction for first-degree kidnapping requires proof that a victim was seized or detained for one of certain specifically enumerated purposes, including (among other things) for the purpose of committing one of the listed predicate felonies such as sexual assault, extortion, robbery, or homicide. Dual convictions under both statutes are permitted based upon the same conduct. However, in such cases, the Nevada Supreme Court has held:

> to sustain convictions for both robbery and kidnapping arising from the same course of conduct, any movement or restraint must stand alone with independent significance from the act of robbery itself, create a risk of danger to the victim substantially exceeding that necessarily present in the crime of robbery, or involve movement, seizure or restraint substantially in excess of that necessary to its completion.

*Mendoza v. State*, 122 Nev. 267, 275, 130 P.3d 176, 181 (2006). In general, "[w]hether the movement of the victims is incidental to the associated offense and whether the risk of harm is substantially increased thereby are questions of fact to be determined by the trier of fact in all but the clearest cases." *Curtis D. v. State*, 98 Nev. 272, 274, 646 P.2d 547, 548 (1982).

The Nevada Supreme Court has held that moving a victim from one room inside a house to another room in search of valuables during the commission of a robbery is insufficient, by itself, to sustain convictions for both kidnapping and robbery. *See Wright v. State*, 94 Nev. 415, 417-18, 581 P.2d 443-44 (1978) (reversing kidnapping conviction as incidental to robbery when movement from room to room occurred "only for the short period of time necessary to consummate the robbery" for purposes of locating valuables). *Wright* is the principal authority relied upon by Gonzales in challenging his kidnapping conviction.

In this case, Michelle was accosted at gunpoint while in her garage with the door open and the interior visible to her neighbors, and then forced into the residence and moved from room to room. The jury could have found that, by moving Michelle from a public place into a private one, Gonzales substantially increased the risk of harm to Michelle, because had Michelle been detained in the open garage while her residence was ransacked, she might have had a chance to cry out to her neighbors

for help, and she might even have found an easier opportunity to escape while her house was being searched room by room. But these opportunities were diminished once she was removed from public view. Furthermore, moving Michelle from the open garage into the secluded interior of the locked house, and then throughout the house, may have psychologically emboldened the defendant to escalate the violence of the crime, as well as to extend the length of time over which it took place, once Michelle's fate was less likely to be witnessed by her neighbors.

Gonzales nonetheless argues that he cannot be convicted of both kidnaping and robbery because Michelle was only moved into the house to help search for valuables during the robbery. Gonzales' argument touches upon one of the curiosities of the *Mendoza* doctrine, which fundamentally asks the jury to define the level of violence acceptably necessary to commit the crime of robbery. Gonzales contends that Michelle's detention was inherent in, and necessary to, the robbery because she was only detained for as long as it took to ransack the house and was only moved within the house for the purpose of aiding in the search for valuables. In essence, he avers that Michelle's movement cannot constitute a kidnapping because it was closely related, spatially and temporally, to the facts required to prove the elements of the crime of robbery.

Some cases contain language supporting Gonzales' argument. *See Wright*, 94 Nev. at 417-18, 581 P.2d at 443-44 (referring to the "short period of time" during which robbery occurred). However, casting the *Mendoza* test solely or primarily in relation to overlapping space and time raises logical problems. A robbery can take place over extended distance and time, including efforts to escape the scene after property has been taken. *See Fouquette v. State*, 67 Nev. 505, 527-28, 221 P.2d 404, 416-17 (1950). In this case, Michelle was detained for somewhat less than an hour while the criminals ransacked the house. But Gonzales' argument suggests that a victim could be detained for much longer, many hours or perhaps even days, without converting a robbery into a kidnapping so long as the criminals continue to leisurely search for valuables during the entire period. It also suggests that a victim could be physically transported over vast distances without being kidnapped, so long as the purpose of the transportation is to collect the victim's far-flung possessions. Thus, under Gonzales' theory, had Michelle owned a vacation home in Miami, transporting her thousands of miles from Las Vegas to Florida over a period of many days could conceivably have been necessary to effectuate the taking of all of her possessions; but that argument is clearly not what *Mendoza* envisioned. [Footnote 4: Conversely, it is also true that multiple crimes can occur within a very small window of time and space; here, Gonzales does not challenge the validity of his convictions for burglary and conspiracy based upon facts occurring in rapid succession and in close physical proximity to the facts underlying the robbery conviction. *See Garcia v. State*, 121 Nev. 327, 344, 113 P.3d 836, 847 (2005) (affirming convictions for kidnapping, robbery, and conspiracy based on events occurring close together in time and within the same room).]

2

In this case, Michelle was moved from the open garage into the house, and then from room to room, while the criminals ransacked the entire home. Gonzales argues that the movement was intended to assist him in locating valuables, but as it turned out, Michelle provided almost no help because she did not know where her husband had stored his weapons. Indeed, her assistance turned out to be so inconsequential that the criminals berated her for her ignorance. Yet, even after realizing she could provide little guidance to them, the perpetrators nonetheless continued moving her to different rooms for no ascertainable purpose. Under these facts, the jury could have found that the robbery could have been successfully completed by simply detaining Michelle in the garage while other accomplices searched through the residence for valuables without her, and Michelle was therefore unnecessarily forced at gunpoint into the house when she did not need to be for the robbery to occur and her concealment increased the danger to her and allowed the crime to continue unabated for much longer than it otherwise might have.

Under the circumstances of this case, the jury could reasonably have found that Michelle's movement substantially exceeded that necessary to complete the robbery and/or substantially increased the harm to her. Whether Michelle's movement was incidental to the robbery, and whether the risk of harm to her was substantially increased, are questions of fact to be determined by the jury in "all but the clearest of cases." *Curtis D.*, 98 Nev. at 274, 656 P.2d at 548. We conclude that this is not one of the "clearest" of cases in which the jury's verdict must be deemed unreasonable. We therefore conclude that the evidence presented to the jury was sufficient to convict Gonzales of both robbery and first-degree kidnapping.

ECF No. 29-9 at 21-26. The Nevada Court of Appeals' rejection of Gonzales' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

**A.    Legal Standard**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "*any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citation omitted). The evidence is to be viewed "in the light most favorable to the prosecution." Id. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

### B.    Relevant Evidence

On November 15, 2012, Michelle Dimaya was living with her husband and twenty-two-month-old daughter in an established and lively neighborhood in Las Vegas, Nevada. ECF No. 26-2 at 10, 13. On that day, Dimaya put her daughter down for a nap around 1:30 p.m., and after her husband left for work around 2:00 p.m., she "went into the garage to vacuum [her] car." Id. at 13. While she was vacuuming the backseat of her car, Dimaya "heard commotion or footsteps," and when she looked, she saw three individuals—two men and a woman— "standing directly next to [her]." Id. at 14-15. The first man, who Dimaya identified as Gonzales, was wearing a mask and brown hoodie with the hood up and was pointing a gun at Dimaya. Id. at 15. Gonzales told Dimaya several times that they wanted guns and money. Id. at 17. The woman then "g[a]ve [Dimaya] the head motion, like, go in." Id. at 18. In response, Dimaya "turned around and walked into the house," and the three individuals followed her. Id.

Dimaya went directly to the master bedroom because "[t]hey were asking for guns and money," and the master bedroom was "where [those items] were" kept. Id. at 71-72. The three then "just started going through everything, ransacking everything, flipping the mattress, going through the drawers." Id. at 19-20. "At some point [Dimaya] asked to get [her] daughter," but Gonzales refused her request. Id. at 22.

2

The individuals eventually found a safe and requested that Dimaya open it. Id. at 24. Dimaya complied, and the individuals took items from the safe, including birth certificates, social security cards, and cash. Id. The woman, later identified as Melody Morgan, made Dimaya hold laundry baskets "[s]o she could fill them [with] belongings." Id. at 26. Morgan "kept telling [Dimaya] that [she] was F'ing stupid" because she did "not know where anything in [her] house was."[1] Id.

Dimaya asked again to retrieve her daughter, and, this time, Gonzales allowed her to do so. Id. at 27. Dimaya retrieved her daughter and returned to the master bedroom. Id. at 28. Dimaya then began crying, and Gonzales told her to "keep it down" and that they were "not going to hurt [her]." Id. at 29.

The individuals then started going into different rooms within the house. Id. Dimaya was left with the other man, later identified as Edgar Solano-Ramirez, in the master bedroom. Id. at 31. Solano-Ramirez eventually found a gun hidden behind a television. Id. Morgan went into a spare bedroom and yelled for Dimaya to join her. Id. While Dimaya was standing at the entry of the spare bedroom holding her daughter, Solano-Ramirez was going through a hall closet nearby, and Dimaya asked him why they were there. Id. at 35. Solano-Ramirez said that they were hired by somebody to get their guns and money. Id. While the individuals were in different rooms, Dimaya noticed that she was out of sight, so she unlocked the door, opened it, and ran to a neighbor's house. Id. at 39. Dimaya then called 911. Id. at 41.

Dimaya testified that Solano-Ramirez had a gun in the house, but she did not know if he had it in the garage or not. Id. at 56. And at one point, Solano-Ramirez put the gun on Dimaya's

---

[1] Dimaya did not know where their guns were located because her husband had recently moved them so that their daughter would not be able to grab them. ECF No. 26-2 at 21-22.

dresser. <u>Id.</u> at 65. Dimaya testified that none of the individuals pointed a gun at her while they were in the house. <u>Id.</u> at 64-65.

On November 15, 2012, Brittany Lewis, a neighbor who lived behind the Dimayas, testified that she heard a loud noise, and when she "looked out the window of [her] house[,] . . . there was somebody jumping the back fence." ECF No. 26-2 at 122-123. <u>See also</u> ECF No. 27-5 at 22. Lewis described the two individuals she observed jump the fence: a woman with black hair who was wearing a baseball T-shirt and a man wearing a tan jacket with a hood over his head "carrying what looked like a gun." ECF No. 26-2 at 125. The two individuals walked through Lewis' backyard to a side gate leading to the front of the house. <u>Id.</u> at 127. The two individuals then started walking separate ways. <u>Id.</u> at 128.

Detective Michael Cruz testified that he was dispatched to the robbery at the Dimaya residence on November 15, 2012. ECF No. 25-17 at 36, 38. While standing outside of his vehicle near the residence, Detective Cruz was approached by Gonzales who had his hands in the air and stated, "It was me. I was involved." <u>Id.</u> at 39-40. Gonzales was then taken into custody and searched. <u>Id.</u> at 41. During his search of Gonzales, Detective Cruz found a blue satchel, car keys, identification, an envelope containing a large amount of cash, a birth certificate, and a social security card. <u>Id.</u> at 42. Gonzales told Detective Cruz that "somebody by the name of Melody made him do it." <u>Id.</u> at 57. Gonzales also told Detective Cruz that he was a confidential informant. <u>Id.</u> at 58.

After being transported to the police station, Detective Pat Flynn interviewed Gonzales. ECF No. 27-1 at 45, 48. During the interview, Gonzales stated that "he participated in going through the home" and that "[h]e was the one with the real gun." <u>Id.</u> at 52. Gonzales stated that Morgan was in charge and that he was afraid of Morgan and Solano-Ramirez. <u>Id.</u> at 69, 87.

1        **C.      Charges and Relevant Statutes**

2        Gonzales was convicted of conspiracy to commit robbery, burglary while in possession of

3   a deadly weapon, robbery with the use of a deadly weapon, and first-degree kidnapping with the

4   use of a deadly weapon. ECF No. 28-7. Gonzales' sufficiency-of-the-evidence claim only takes

5   issue with his robbery and first-degree kidnapping convictions. ECF No. 12 at 6. Regarding

6   robbery, the State alleged that Gonzales "did then and there willfully, unlawfully, and feloniously

7   take personal property . . . from the person of Michelle Dimaya, or in her presence, by means of

8   force or violence or fear of injury to, and without the consent and against the will of the said

9   Michelle Dimaya." ECF No. 27-4 at 2-3. Regarding first-degree kidnapping, the State alleged that

10  Gonzales "did willfully, unlawfully, feloniously, and without authority of law, seize, confine,

11  inveigle, entice, decoy, abduct, conceal, kidnap, or carry away Michelle Dimaya, a human being,

12  with the intent to hold or detain the said Michelle Dimaya against her will, and without her consent,

13  for the purpose of committing robbery." Id. at 3.

14       Sufficiency of the evidence claims are judged by the elements defined by state law.

15  Jackson, 443 U.S. at 324 n.16. At the time of the offense and Gonzales' trial and sentence, Robbery

16  was defined as "the unlawful taking of personal property from the person of another, or in his

17  presence, against his will, by means of force or violence or fear of injury, immediate or future, to

18  his person or property, or the person or property of a member of his family . . . ."[2] Nev. Rev. Stat.

19  § 200.380(1). "A taking is by means of force or fear if force or fear is used to: (a) Obtain or retain

20  possession of the property; (b) Prevent or overcome resistance to the taking; or (c) Facilitate

21  escape." Id. Nev. Rev. Stat. § 200.310(1) defines kidnapping: "[a] person who willfully seizes,

22

23
_____

[2] Nev. Rev. Stat. § 200.380(1) has since been revised to be gender neutral and to eliminate fear of injury to property.

confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person . . . with the intent to hold or detain, or who holds or detains, the person . . . for the purpose of committing . . . robbery . . . ."

### D.   Challenged Counts of Conviction

The Nevada Court of Appeals reasonably concluded that there was sufficient evidence presented to the jury to convict Gonzales of robbery and first-degree kidnapping. See ECF No. 29-9 at 27. In Mendoza v. State, the Nevada Supreme Court held that, with regard to a conviction for kidnapping which arises from the same course of conduct as a conviction for robbery, "any movement or restraint must stand alone with independent significance from the act of robbery itself, create a risk of danger to the victim substantially exceeding that necessarily present in the crime of robbery, or involve movement, seizure or restraint substantially in excess of that necessary to its completion." 130 P.3d 176, 181 (Nev. 2006). In other words, "movement or restraint incidental to an underlying offense where restraint or movement is inherent, as a general matter, will not expose the defendant to dual criminal liability under either the first- or second-degree kidnapping statutes." Id. at 180. See also Curtis D. v. State, 646 P.2d 547, 548 (Nev. 1982) ("Whether the movement of the victim is incidental to the associated offense and whether the risk of harm is substantially increased thereby are questions of fact to be determined by the trier of fact in all but the clearest cases."). In the case at hand, the Nevada Court of Appeals reasonably concluded that either of the two latter circumstances could have been found in this case: "Michelle's movement substantially exceeded that necessary to complete the robbery and/or substantially increased the harm to her." ECF No. 29-9 at 25-26.

Gonzales argues that any movement of Dimaya did not substantially increase the risk of danger to Dimaya because no guns were pointed at her inside the house, she was assured that she

2

would not be harmed, and she was the one who brought the individuals into the master bedroom. ECF No. 12 at 8 (citing <u>Wright v. State</u>, 581 P.2d 442, 443-44 (Nev. 1978) (setting aside the defendant's conviction for kidnapping because "the movement of the victim appears to have been incidental to the robbery and without an increase in danger to them. Their detention was only for the short period of time necessary to consummate the robbery"); ECF No. 31 at 11. Although Dimaya testified that the individuals did not point a gun at her after moving her into the house and actually assured her, at that point, that she would not be hurt, ECF No. 26-2 at 29, 64-65, Dimaya was still subjected to an increased risk of harm following her ordered movement into the house. As the Nevada Court of Appeals reasonably noted, moving Dimaya from her garage, which was open to public view, into the secluded interior of her locked house, meant that she was unable to attempt to get a neighbor's attention or escape as easily. ECF No. 29-9 at 23. Furthermore, Dimaya's risk of harm was not diminished once she was moved into the house, as Gonzales appears to contend, because the gun that Gonzales brandished in the garage was still present, and Gonzales, Morgan, and Solano-Ramirez were actively searching for other guns. ECF No. 26-2 at 17, 65.

Gonzales also argues that any movement of Dimaya was simply made to complete the robbery. ECF No. 12 at 8. However, as the Nevada Court of Appeals reasonably noted, the robbery could have been completed by simply detaining Dimaya in the garage and searching for items inside her house without her, especially due to the fact that Dimaya provided little to no guidance to Gonzales, Morgan, and Solano-Ramirez in their search for items within the house. ECF No. 29-9 at 25. Indeed, Morgan even berated Dimaya for her lack of knowledge of the location of items within her house. <u>See</u> ECF No. 26-2 at 26.

Therefore, although Gonzales' convictions for kidnapping and robbery arose from the same course of conduct, the Nevada Court of Appeals reasonably concluded that the evidence presented showed the kidnapping was not incidental to the robbery. See e.g., Stewart v. State, 393 P.3d 685, 688 (Nev. 2017) (concluding that there was sufficient evidence to convict the defendant of first-degree kidnapping and robbery because "a reasonable jury could conclude that [the defendant] forcing [the victim] from her front door into her back bedroom substantially exceeded the movement necessary to complete the robbery and that guarding [the victim] at gunpoint substantially increased the harm to her"); Pascua v. State, 145 P.3d 1031, 1033 (Nev. 2006) (affirming the defendant's dual convictions for kidnapping and robbery because "[a]fter robbing [the victim] in his kitchen of his wallet and obtaining the combination to his safe, [the defendant and co-defendant] dragged [the victim] to his bed where he was subsequently beaten and strangled to death. The movement of [the victim] from the kitchen to his bed could have been determined by the jury to have had independent significance apart from the underlying robbery"). Accordingly, a rational trier of fact could have found beyond a reasonable doubt that Gonzales committed both robbery and first-degree kidnapping. In re Winship, 397 U.S. at 364; Jackson, 443 U.S. at 319; Juan H., 408 F.3d at 1275 n.13; Nev. Rev. Stat. § 200.380(1); Nev. Rev. Stat. § 200.310(1).[3] Gonzales is denied federal habeas relief.

//

---

[3] Gonzales requested that this Court "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in [his] amended petition and any defenses that may be raised by respondents." ECF No. 12 at 9; ECF No. 31 at 12. Gonzales fails to explain what evidence would be presented at an evidentiary hearing, especially since an insufficiency-of-the-evidence claim rests on the trial record. Additionally, this Court has already determined that Gonzales is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. Gonzales' request for an evidentiary hearing is denied.

**IV.    CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Gonzales. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA). Thus, this Court has *sua sponte* evaluated the claim within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)). Applying these standards, this Court finds that a Certificate of Appealability is unwarranted.

**V.     CONCLUSION**

**IT IS THEREFORE ORDERED** that the First Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 12) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is denied a Certificate of Appealability.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter judgment accordingly.

Dated: October 7, 2020

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE

2